IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBRA D. SHERMAN,

           Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security
Administration,

           Defendant.

_____

Civ. No. 6:13-cv-00686-MC

OPINION AND ORDER

MCSHANE, Judge:

      Plaintiff Debra Sherman brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) and supplemental security income payments (SSI) under Titles II and XVI of the Social Security Act. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The issues before this Court are: (1) whether the Administrative Law Judge (ALJ) erred in evaluating the evidence submitted by plaintiff and treating physician, Dr. Buscemi, and (2) whether the ALJ erred in evaluating plaintiff's headache symptoms under step two and four of the sequential evaluation. Because the ALJ articulated sufficient reasons supported by substantial evidence in the record for his evaluation of the respective evidence, the Commissioner's decision is AFFIRMED.

## PROCEDURAL AND FACTUAL BACKGROUND

      Plaintiff applied for DIB and SSI on July 3, 2006, alleging disability since June 30, 2006. Tr. 12, 107, 176–184. These claims were denied initially and upon reconsideration. Tr. 12, 107,

1 – OPINION AND ORDER

120–29, 131–34. Plaintiff timely requested a hearing before an ALJ, and appeared before the

Honorable John J. Madden on September 17, 2008. Tr. 54–98, 107. ALJ Madden denied

plaintiff's claims by written decision dated December 24, 2008. Tr. 12, 107–116. Plaintiff sought

review from the Appeals Council. Tr. 150–52.

     Plaintiff filed new applications for DIB and SSI on January 20, 2009, alleging disability

since December 25, 2008. Tr. 12, 118. Plaintiff was granted DIB, tr. 12, 103, but denied SSI

because of her excess income, tr. 12, 117.

     On January 19, 2011, the Appeals Council granted review of plaintiff's unfavorable

decisions from 2008, reopened plaintiff's favorable decision from 2009, and consolidated

plaintiff's claims. Tr. 12–13, 117–19. The Appeals Council directed ALJ Madden, upon remand,

to resolve differences between plaintiff's 2008 and 2009 residual functional capacity (RFC)

assessments and to obtain supplemental vocational expert (VE) testimony to clarify the effect of

assessed limitations. Tr. 12–13, 119.

     Plaintiff appeared before ALJ Madden a second time on November 8, 2011. Tr. 13, 33–

53. ALJ Madden denied plaintiff's claims by written decision dated January 20, 2012. Tr. 12–25.

Plaintiff sought review from the Appeals Council, which was subsequently denied, tr. 1–3, thus

rendering the ALJ's decision final. Plaintiff now seeks judicial review.

     Plaintiff, born on September 5, 1962, tr. 23, 114, graduated high school, obtained a

Certified Nurse Assistant (CNA) diploma, and worked most recently as a Lab

Assistant/Phlebotomist (1994–2006). Tr. 60–63, 206–207. Plaintiff was forty-three at the time of

alleged disability onset, and forty-nine at the time of her second hearing. *See* tr. 23, 38.[1] Plaintiff

---

[1] Plaintiff was a "[y]ounger person" at the time of alleged disability onset and at the time of her second hearing. *See* 20 C.F.R. § 404.1563(c).

alleges disability due to: systemic lupus erythematosus[2] with renal involvement and bilateral two through five digit deformities. Tr. 15–16.[3]

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence on the record. *See* 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). To determine whether substantial evidence exists, this Court reviews the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

## DISCUSSION

The Social Security Administration utilizes a five step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The initial burden of proof rests upon the claimant to meet the first four steps. If a claimant satisfies his or her burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's RFC, age, education, and work experience. *Id*.

Plaintiff contends that the ALJ erred in formulating and applying plaintiff's RFC under step four and five of the sequential evaluation.[4] In particular, plaintiff argues that: (1) the ALJ

---

[2] Systemic Lupus Erythematosus is "an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions on the face, neck, or upper extremities, with liquefaction degeneration of the basal layer and epidermal atrophy, lymphadenopathy, pleurisy or pericarditis, glomerular lesions, anemia, hyperglobulinemia, and a positive LE cell test result, with serum antibodies to nuclear protein and sometimes to double-stranded DNA and other substances." Stedman's Medical Dictionary 1124 (28th ed. 2006).
[3] Plaintiff cites additional limitations not listed as severe impairments by the ALJ, including: depression, headaches, and an immunosuppressed state. Pl.'s Br. 18–20, ECF No. 15.

erred in evaluating plaintiff's testimony; (2) the ALJ erred in evaluating Dr. Buscemi's opinion; and (3) the ALJ erred in evaluating plaintiff's headache symptoms.

## I. Plaintiff's Testimony

Plaintiff contends that the ALJ improperly rejected her testimony. Pl.'s Br. 13–16, ECF No. 15. In response, defendant argues that the ALJ gave clear and convincing reasons for rejecting plaintiff's testimony. Def.'s Br. 4–7, ECF No. 17.

An ALJ must consider a claimant's symptom testimony, including statements regarding pain and workplace limitations. *See* 20 CFR §§ 404.1529, 416.929. "In deciding whether to accept [this testimony], an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). If a claimant meets the *Cotton* analysis[5] and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). This Court "may not engage in second-guessing," *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted), and "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation," *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) (citations omitted).

---

[4] The ALJ found that plaintiff had the RFC to:

> [P]erform[] light work . . . except for frequently climbing ramp/stairs; occasionally climbing ladder/rope/scaffolds; occasionally crawling; frequently balancing, stopping, kneeling or crouching; occasionally bilateral handling and fingering; unlimited reaching in all directions including overhead; unlimited feeling; and avoidance of concentrated exposure to hazards.

Tr. 18.

[5] "The Cotton test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (citing *Cotton v. Bowen*, 799 F.2d 1403, 1407–408 (9th Cir. 1986)).

The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC. Tr. 21, 23; *see also supra* note 4 (identifying plaintiff's RFC). The ALJ's credibility analysis relied on four reasons, including: (1) inconsistency with medical evidence; (2) sporadic and routine treatment; (3) inconsistent statements and actions; and (4) daily activities. This Court looks to those reasons.

First, as to inconsistency with medical evidence, the ALJ Found:

> [T]here is no objective medical evidence of lupus-induced persistent profound symptoms to any of her body systems. Her treating nephrologist Dr. Purvis has documented infrequent lupus-induced flares of inflammation in her kidneys. Otherwise, her lupus and kidney functioning consistently has been stable, asymptomatic, doing well and/or in remission based on her clinical signs since September 2006. Consistent therewith, she has had overwhelmingly normal protein and creatinine levels on labs. (September and November 2006; January, March, May[,] July, October[,] and December 2007; January and April 2008; April 2009; February, August and September 2010; and February, April and July 2011 (Exhibits 1F [tr. 296]; 11F [tr. 333]; 17F [tr. 371]; 23F [tr. 402–404, 407–410]; 25F [tr. 437–38, 440–42, 444–45, 447, 450–53]; 35F [tr. 536, 540]; 39F [tr. 593, 606–612]; 40F [tr. 521, 631, 636, 638, 645]).

> . . . .

> [B]etween August 2006 and October 2011, treating rheumatologist Dr. Boren found no evidence of progression in her lupus-induced bilateral two through five digit deformities. While he documented waxing and waning bruising, tenderness, swelling and/or effusion in her fingers, they rapidly improved on CellCept. Dr. Boren consistently found her lupus and digit deformities were stable (Exhibits 24F, [tr. 415]; 26F [tr. 466]; 25F [tr. 430–35, 438]; 21F [tr. 386, 388, 390]; and 14F [tr. 357–58]; 11F [tr. 327–28]; 42F [tr. 655].[6] While the claimant has osteopenia based DEXA studies (Exhibit 40F [tr. 627]), bilateral hand x-rays imaged maintained joints with no fracture, dislocation or focal swelling (Exhibit 37F [tr. 564–65]). In December 2006 and April 2009, Christopher Komanapali, M.D., and Dr. DeWayde evaluated the claimant's bilateral two through five digit deformities. She had no evidence of tenderness, effusion, crepitus or pain.

---

[6] This Court notes that Exhibits 11F, tr. 327–28, and 24F, tr. 415, are Dr. Buscemi's treatment notes.

She had no weakness or lack of endurance. She had no in coordination. In her upper extremities, she retained full motion, motor strength, bulk and tone. Her hands had the ability to grasp and manipulate both large and small objects with the first three digits, bilaterally. Her thumbs had normal opposition. She had no evidence of myotonia or grip release. In all digits bilaterally, she had intact sensory findings to light, deep and vibratory touch; normal reflexes; and intact cranial nerves. While she had obvious bilateral deformity at digits two through five, the claimant had normal joint position and intact grasping abilities to the extent consistent with the residual functional capacity below, which is not listing level. Finally, even with repetitive bilateral hand function, she had no diminution of strength (Exhibits 8F [tr. 314–18] and 37F [tr. 559–65]).

Tr. 21–22.

The ALJ, having considered the medical evidence, concluded that plaintiff's lupus and kidney functioning were consistently stable, asymptomatic, doing well and/or in remission based on her clinical signs since September 2006 except for documented infrequent lupus-induced flares of inflammation in her kidneys. Tr. 21. Plaintiff disputes the medical evidence and directs this Court's attention to the record.

Plaintiff cites increased protein and creatinine levels reported in the record. However, consistent with the ALJ's findings, those incidents can be reasonably interpreted as infrequent lupus-induced flares of inflammation in plaintiff's kidneys. For example, on January 26, 2009, Dr. Purvis noted gradually increased proteinuria. Tr. 537; *see also* tr. 545 (On January 27, 2009, Dr. Boren, noted increased proteinuria, but good creatinine clearance.); tr. 625 (On March 3, 2009, Dr. Buscemi, noted significant proteinuria.). Dr. Purvis prescribed Cytoxan, tr. 537, which resulted in steady improvement in plaintiff's proteinuria with excellent creatinine clearance by April 2009, tr. 604; *see also* tr. 577 (On June 3, 2009, Dr. Boren noted lupus improvement.).[7]

---

[7] Plaintiff also cites Dr. Boren's August 31, 2010 treatment notes. Dr. Boren reported that plaintiff's urine revealed a significant amount of proteinuria. Tr. 621. However, Dr. Purvis, having met with plaintiff on September 24, 2010, reported that plaintiff's lupus nephritis was in remission and that plaintiff was doing well with her medications. Tr.

Plaintiff also argues that the medical evidence is "not inconsistent" with plaintiff's claim that any activity aggravates her hand pain. Plaintiff directs this Court's attention to the treatment notes of Christopher Komanapalli, M.D., and DeWayde Perry, M.D. Pl.'s Br. 14–15, ECF No. 15. On August 24, 2006, Dr. Komanapalli, an agency examining physician, found: "[g]rasping Ability: Is significant[ly] compromised by the claimant's obvious deformity at digits 2-5 of bilateral hands; however, her grasping capabilities are intact. Tr. 317. Dr. Komanapalli concluded that plaintiff was limited to lifting 10 pounds frequently and 20 pounds occasionally because of her arthritis in her hands. Tr. 318. This finding is consistent with plaintiff's RFC. *Compare supra* note 4, *with* 20 C.F.R. § 404.1567(b) (defining light work). Dr. Komanapalli also concluded that plaintiff had "manipulative limitations" in reaching, handling, feeling and grasping, but intact grasping capabilities. Tr. 318.

On April 16, 2009, Dr. Perry met with plaintiff and largely affirmed Dr. Komanapalli's findings. Dr. Perry reported: "[t]he claimant is able to grip and hold objects securely . . . by the last three digits . . . . [and] grasp and manipulate both large and small objects with the first three digits . . . . She has no limitations on reaching, but may occasional[ly] handle, finger, and feel with bilateral hands. Tr. 562–63. The ALJ, having considered both physicians' findings, *see* tr. 22, reasonably concluded that this evidence, particularly when combined with Dr. Boren's treatment records, did not support the severity of plaintiff's symptom allegations. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005) ("If the record would support more than one rational interpretation, we defer to the ALJ's decision." (citation omitted)).

Second, as to sporadic and routine treatment, the ALJ found:

---

596; *see also* tr. 594 (Dr. Purvis, on April 8, 2010, reported that plaintiff was generally stable, doing well, and that her lupus was under good control.).

[T]he claimant has had sporadic and routine treatment for her lupus nephritis[8] for sixteen months between December 2005 and April 2007, more than one year after her alleged disability onset. Next, she did not seek treatment for eight months from April 2009, to February 2010 (Exhibits 39F [tr. 598, 604]). He saw her just once in 2009 and saw twice annually in 2007, in 2008, and 2010. Her last visit was on April 2011. Follow-up in six months is indicative of typical care (Exhibits 1F [tr. 295–302], 23F [tr. 400–410], 27F [tr. 467–72]; 35F [tr. 531–40]; 39F [tr. 588–612]; 41F [tr. 648–653]; and 17E [tr. 290–294]). Thus, Dr. Purvis' care for the claimant is entirely incompatible with that of someone who has debilitating lupus symptoms, or whose lupus has declined to the point that it has become debilitating.

Tr. 21. Plaintiff disputes the evidentiary record and the ALJ's characterization of her treatment as "routine" and "sporadic." *See* Pl.'s Reply Br. 3, ECF No. 20.

On or about September 17, 2004, plaintiff's rheumatologist, Simona Boren, M.D., and plaintiff's primary care physician, Marie Buscemi, M.D., referred plaintiff to Mattox Purvis, M.D., a nephrologist.[9] Tr. 298–299. Plaintiff continued to meet with Dr. Purvis for ongoing evaluation and management of her lupus nephritis between 2004 and the most recent hearing on November 8, 2011. *See, e.g.*, tr. 296 (December 19, 2005); tr. 405 (April 23, 2007); tr. 468 (July 30, 2008); tr. 536 (January 26, 2009); tr. 598 (February 24, 2010); tr. 593 (April 8, 2011). The ALJ characterized Dr. Purvis's care for plaintiff's lupus nephritis as "sporadic" and "routine."

On December 19, 2005, Dr. Purvis reported that plaintiff had stable renal function, mild lupus nephritis, and no change in present regime. Tr. 296. Plaintiff was directed to return in eight months. *Id.* Plaintiff next met with Dr. Purvis on April 23, 2007. Tr. 405 ("Debbie is back today, actually quite a bit late."). At that office visit, plaintiff indicated that she was feeling fine since the last visit, no new problems, and no recent kidney problems. *Id.*

---

[8] Nephritis is inflammation of the kidneys. Stedman's Medical Dictionary 1289 (28th ed. 2006).
[9] Nephrology is the "branch of medical science concerned with medical diseases of the kidneys." Stedman's Medical Dictionary 1290 (28th ed. 2006).

8 – OPINION AND ORDER

Plaintiff argues, in reliance upon appointments with her rheumatologist,[10] Dr. Boren, and her primary care physician, Dr. Buscemi, that the ALJ mischaracterized her lupus treatment. Pl.'s Reply Br. 13, ECF No. 20. For example, between December 2005 and April 2007, plaintiff met with Dr. Boren on January 30, 2006, tr. 550, March 29, 2006, tr. 549, June 12, 2006, tr. 548, September 12, 2006, tr. 435, November 15, 2006, tr. 434, January 16, 2007, tr. 390, and March 19, 2007, tr. 388–89. Likewise, plaintiff met with Dr. Buscemi on June 22, 2006, tr. 521, July 13, 2006, tr. 328, September 7, 2006, tr. 327; and December 1, 2006, tr. 418.

These additional appointments, however, do not undermine the ALJ's conclusion that Dr. Purvis's care for plaintiff's lupus *nephritis* symptoms was routine and sporadic. Plaintiff, having been specifically referred to Dr. Purvis for lupus nephritis care, generally met with Dr. Purvis at six-month intervals. *See* tr. 405 (April 23, 2007); tr. 403 (July 13, 2007); tr. 401 (January 25, 2008); tr. 468 (July 30, 2008); tr. 536 (January 26, 2009); tr. 604 (April 27, 2009); tr. 598 (February 24, 2010); tr. 595 (September 24, 2010); tr. 593 (April 8, 2011). Thus, the ALJ's finding as it relates to plaintiff's lupus nephritis symptoms is supported by substantial evidence. *See also* SSR 96-7P, 1996 WL 374186, at *7 (July 2, 1996) ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . .."); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (noting that the ALJ "is permitted to consider lack of treatment in his credibility determination").

Third, as to plaintiff's inconsistent statements and actions, the ALJ found:

> Inconsistent statements and actions further undermine the claimant's credibility. First, entirely contrary to her allegations of persistent constant lupus limitations to Social Security, the medical evidence shows she has

---

[10] A rheumatologist is specifically trained to treat lupus, a rheumatic condition. *See* American College of Rheumatology, *Outreach Efforts: Could I have Lupus?*, https://www.rheumatology.org/about/lupus.asp (last visited Sept. 8, 2014); Stedman's Medical Dictionary 1689 (28th ed. 2006) (defining "rheumatologist" and "rheumatology").

> repeatedly told treating physicians she has had no related activity and has
> done well as to her lupus. She also admitted her joint pain was primarily at
> night and no more than mild (Exhibit 21F [tr. 388]). Elsewhere, she stated
> she has good sleep (Exhibit 24F [tr. 418]). Third, she testified at the second
> hearing that she has never needed prednisone injections, a more aggressive
> modality for lupus, which weighs against the presence of the progressive or
> acute lupus-induced symptoms and pain as alleged.

Tr. 22. Because this Court previously addressed the medical evidence, this Court will focus on

plaintiff's statements relating to her sleep and prednisone injections.

On July 19, 2006, plaintiff reported that "joint and muscle pain makes it hard to sleep."

Tr. 199; *see also* tr. 214 ("muscle pain in legs at night"). In August 2006, plaintiff twice reported

a disrupted sleep pattern (7-10 PM and 6-8 AM). Tr. 314, 319. However, in September and

December 2006, Dr. Buscemi noted that plaintiff's sleep was well/good. Tr. 327, 418; *see also* tr.

388 (On March 19, 2007, plaintiff reported mild joint pain at night.). The ALJ, having reviewed

this evidence, found that plaintiff's inconsistent statements undermined her credibility. This

finding, when considered in the context of plaintiff's other inconsistent statements, *see infra* § I

(discussing daily activities), is supported by substantial evidence.

The ALJ also found that plaintiff had never needed prednisone injections.[11] However,

this conclusion is not supported in the record. Plaintiff took prednisone from 1996 to January

2004. Tr. 78, 215, 557. Thus, to the extent that the ALJ relied on that basis, his finding is not

supported by substantial evidence. *See also Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir.

2012) (noting that "[w]e have . . . deemed errors harmless where the ALJ misstated the facts . . .

but we were able to conclude from the record that the ALJ would have reached the same result

absent the error." (citation omitted)).

Fourth, as to plaintiff's daily activities, the ALJ found:

---

[11] Plaintiff indicated that she had not "taken prednisone at anytime recently." Tr. 44.

> [T]he claimant's lifestyle is inconsistent with disability. She cooks daily for herself and her family. She drives and goes almost every day to run errands. When she goes out, she drives a car or walks. She reads, watches television, uses the computer, types, writes and manages small objects. She lives with and socializes with her significant other. She socializes with family. She plays bingo monthly. She is able to handle her finances. The claimant is able to follow written and spoken instructions. She feeds and cares for her animals. The claimant was going to exercise by walking her dog. She was also moving to live on the lake. She vacuums, sweeps, mops and washes laundry. She mows the lawn with a riding mower (Exhibits 24F [tr. 412]; 9F [tr. 320]; 8F [tr. 314]; 4E, page 5;[12] 6E [tr. 234–37]; and 2E [tr. 198–213). Her allegations to the contrary (See Exhibits 37F [tr. 559]; and 8F [tr. 315]) are not credible, given the above unremarkable objective medical evidence.

Tr. 22. An ALJ can rely on daily activities to form the basis of an adverse credibility determination if those activities contradict a plaintiff's testimony or involve the performance of physical functions that are transferable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Defendant contends that plaintiff's activities contradict her testimony. Def.'s Br. 6–7, ECF No. 17. This Court briefly looks to the record.

On April 24, 2006, plaintiff reported that she was "able to perform self-care including toileting, bathing, and dressing herself," but *unable* to clean her home or perform yard work. Tr. 315; *but see* tr. 200 (On July 19, 2006, plaintiff indicated she prepared meals four to five times each week and was able to vacuum, sweep, mop, mow with a riding lawn mower, and launder clothes.); tr. 217 (On July 19, 2006, plaintiff reported she cooked daily, cleaned her home weekly, laundered her clothes weekly, and went shopping monthly.); tr. 231, 233 (On July 22, 2006, plaintiff's significant other reported that she occasionally prepared "all kinds" of food and was able to do "some cleaning, laundry, cooking."); tr. 320 (On August 26, 2006, plaintiff stated that "she . . . cooks several times per week for herself and her family . . . [and] she does housework . . . .").

---

[12] This record citation (4E page 5) does not exist.

On July 19, 2006, plaintiff indicated that she could no longer walk her dogs. Tr. 217; *but see* tr. 412 (On March 14, 2008, plaintiff informed Dr. Buscemi that she would "take the dog for a walk and try to get more exercise.").

On September 17, 2007, during plaintiff's first administrative hearing, she testified that she cared for her two horses on a daily basis for about an hour each day, including cleaning the stalls (using a stall fork and wheel barrow) and feeding them. Tr. 80–81.

On November 8, 2011, during plaintiff's second administrative hearing, she testified that she was able to clean her house three days a week. Tr. 47. On the remaining four days each week, plaintiff indicated she suffered extreme fatigue but was able to do some chores (e.g., dishes). Tr. 47–48; *but see* tr. 559 (On April 16, 2009, plaintiff reported that "[s]he does not do any cleaning, cooking, or yard work.").

The ALJ, having considered this evidentiary record, reasonably found that many of plaintiff's statements were inconsistent; thereby undermining her credibility. Tr. 21. Accordingly, the ALJ's reliance on the medical evidence, plaintiff's lupus nephritis treatment, and plaintiff's inconsistent statements and actions is sufficient to reject plaintiff's testimony regarding the severity of her symptoms.

## II. Dr. Buscemi's Opinion

Plaintiff contends that the ALJ erred in his consideration of Dr. Buscemi's opinion. *See* Pl.'s Br. 16–18, ECF No. 15. In response, defendant argues that the ALJ provided sufficient reasons for rejecting Dr. Buscemi's opinion. *See* Def.'s Br. 9–11, ECF No. 17.

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss*, 427 F.3d at 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)). "If a treating

12 – OPINION AND ORDER

or examining doctor's opinion is contracted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted). When evaluating conflicting medical opinions, an ALJ need not accept a brief, conclusory, or inadequately supported opinion. *Id.* (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)).

Plaintiff met with her primary care physician, Dr. Buscemi, at least 10 times between her alleged disability onset date (June 30, 2006) and her second administrative hearing (November 8, 2011). *See, e.g.*, tr. 653 (August 25, 2011); tr. 649 (September 23, 2011); tr. 660 (November 4, 2011). Dr. Buscemi opined on multiple occasions that plaintiff's illness precluded her from work. *See, e.g.*, tr. 415 (On August 15, 2007, Dr. Buscemi reported "Lupus with significant disability and fatigue and risk of infection. She should be considered disabled from this viewpoint."); tr. 475 (On August 12, 2008, Dr. Buscemi advised plaintiff "not to attempt work full time in any situation where she needs to be reliably present at work because of her debilitating illness."); tr. 514 (On December 2, 2008, Dr. Buscemi noted she thought plaintiff "disabled because she obviously cannot work in the lab and be exposed to infectious agents while on immunosuppressive drugs. Also, she is exposed to a lot of patients who would breathe on her . . . . She also does not have the dexterity in her hands to do the fine work that is required with lab work.").

Following the first administrative hearing (September 17, 2008), ALJ Madden sought additionally clarification from Dr. Buscemi: "What I am soliciting from you is clarification of specifically what you are relying on from an objective and clinical basis to determine that the claimant is unable to work due to her 'debilitating' illness?" Tr. 488. In response, Dr. Buscemi resubmitted her treatment notes from August 12, 2008. *Compare* tr. 473–76, *with* tr. 490–91.

13 – OPINION AND ORDER

The ALJ, having reviewed Dr. Buscemi's treatment notes and objective findings, assigned no weight to Dr. Buscemi's disability opinion because it was inconsistent with her own treatment notes, based largely on the plaintiff's own subjective complaints, and was inconsistent with the medical evidence of record. *See* tr. 19–20.

As to Dr. Buscemi's treatment notes and objective findings, the ALJ found that Dr. Buscemi's "longitudinal objective clinical signs and lab panels contain no evidence of progressive persistent active lupus." Tr. 20. For example, in August 2008, Dr. Buscemi noted that plaintiff could not withstand a job because of an inability to withstand prolonged sitting, standing and exposure to the outdoors. Tr. 475. However, Dr. Buscemi's treatment notes indicated that plaintiff's physical examination was largely normal; plaintiff "had no acute arthritis without swelling," was on "mild suppressive drugs," and "doing well on her medication regime." Tr. 475; *see also* tr. 412 (On March 14, 2008, Dr. Buscemi reported that plaintiff was doing relatively well with the same medications, and plaintiff's joints were not swollen, red or tender."); tr. 653 (On August 25, 2011, Dr. Buscemi documented that plaintiff's lupus had been "relatively quiescent," and "doing relatively well."); tr. 649–50 (On September 23, 2011, Dr. Buscemi reported plaintiff did not have "join pain, joint swelling" and had a "full range of motion of all joints."); tr. 660, 662 (On November 4, 2011, Dr. Buscemi noted that plaintiff's "lupus is relatively stable for a patient with lupus," her creatinine was stable, and that she had no "obvious joint involvement today[;] joints without swelling or tenderness.") These notes, at least in part, can reasonably be interpreted to contradict Dr. Buscemi's statements assessing plaintiff's ability to work. *See Bayliss*, 427 F.3d at 1216 (concluding that discrepancies between treatment notes and statements can constitute a clear and convincing reason for rejecting physician opinion).

14 – OPINION AND ORDER

As to plaintiff's subjective complaints, plaintiff does not dispute that Dr. Buscemi relied, at least in part, on these complaints. *See* Pl.'s Reply Br. 5, ECF No. 20. The ALJ, having properly rejected plaintiff's testimony, *see supra* § I, reasonably found that Dr. Buscemi "improperly relied on the claimant's subjective complaints." Tr. 20; *see Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010) (finding that an ALJ gave specific and legitimate reasons for partially rejecting a physician's opinion where the opinion was "based almost entirely on the claimant's self-reporting.").

As to inconsistency with the medical evidence of record, the defendant directs this Court's attention to the opinions of Richard Alley, M.D., and Linda Jensen, M.D. Def.'s Br. 9, ECF No. 17. In September 2006, Dr. Alley submitted a physical assessment and found plaintiff capable of light work with limited fine manipulation, including frequent fine fingering, manipulation of small objects and keyboarding. Tr. 351. In November 2006, Dr. Jensen submitted a physical assessment which largely affirmed Dr. Alley's earlier physical assessment. *See* tr. 372–79. However, Dr. Jensen recognized additional limitations in handling (gross manipulation), concluding that plaintiff could engage in occasional bilateral handling and fingering. Tr. 375. These opinions, expressly adopted by the ALJ, tr. 19–20, conflict with Dr. Buscemi's conclusion that plaintiff is disabled. *See also* tr. 314–318 (On August 24, 2006, Dr. Komanapalli indicated plaintiff had limitations in manipulation, but no limitations in standing, sitting, or walking); tr. 559–563 (On April 16, 2009, Dr. Perry indicated plaintiff had limitations in manipulation, but no limitations in standing and walking); *McLeod v. Astrue*, 640 F.3d 881, 884 – 85 (9th Cir. 2010) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." (citations omitted)).

15 – OPINION AND ORDER

The ALJ, in reliance upon the treatment notes of Dr. Boren and Dr. Purvis, also found:

> Dr. Buscemi is an internist whereas treating Drs. Boren and Purvis are respectively a rheumatologist and a nephrologist. As such, Drs. Boren and Purvis are better qualified than is Dr. Buscemi to assess the work-related impact of the claimant's lupus, which is a chronic inflammatory disease that occurs when your body's immune system attacks your own tissues and organs. Drs. Boren and Purvis have treated and evaluated the claimant's lupus and lupus-induced symptoms, primarily nephritis episodes, since December 2005. As explained in the medical evidence below, Drs. Boren and Purvis have consistently found the claimant's lupus and related symptoms and/or pain was stable. Neither has endorsed disability for her.

Tr. 20. This Court previously found that substantial evidence supported the ALJ's conclusion that Dr. Purvis's care for plaintiff's lupus nephritis symptoms was routine and sporadic. *See supra* § I. Dr. Boren, like Dr. Purvis, consistently found that plaintiff's symptoms and/or pain were stable. *See, e.g.*, tr. 296 (On December 19, 2005, Dr. Boren reported "[s]table renal function [and] [m]ild lupus nephritis."); tr. 357 (On September 12, 2006, Dr. Boren reported stable lupus, improved hand pain, and improved protein levels in urine.); tr. 386 (On May 21, 2007, Dr. Boren reported some joint pain, probably stable lupus, and limited swelling/joint pain.); tr. 430 (On March 31, 2008, Dr. Boren reported that plaintiff had stable lupus, was feeling fairly well, and had some mild joint aches."); tr. 547 (On September 11, 2008, Dr. Boren reported that plaintiff's joints and a photosensitive malar rash were improved); tr. 656 (On August 3, 2011, Dr. Boren noted that plaintiff's lupus seemed stable and that plaintiff had "mild dull achy pain in her hands, especially later at night, but it *seems to be stable and not very bothersome*." (emphasis added)).

The ALJ, having considered all three of these reasons, reasonably concluded that this evidence conflicted with Dr. Buscemi's disability conclusion. These reasons are sufficient to reject Dr. Buscemi's disability conclusion.

16 – OPINION AND ORDER

This Court's inquiry, however, is not finished. Plaintiff also contends that the ALJ erred in rejecting Dr. Buscemi's opinion relating to limitations in public exposure and depression at step two and four of the sequential evaluation. Pl.'s Br. 17–18, ECF No. 15.

Dr. Buscemi opined on at least two occasions that plaintiff "cannot be around crowds or the public because of her immunocompromised state." Tr. 474 (August 12, 2008); *see also* tr. 412 (March 14, 2008).[13] The ALJ, having considered these statements, *see* tr. 19–20, rejected Dr. Buscemi's prescribed limitations in public exposure. Tr. 19. The ALJ again proffered that Dr. Buscemi's opinion was inconsistent with her own treatment notes, based largely on the plaintiff's own subjective complaints, and was inconsistent with the medical evidence of record. Tr. 20. These reasons are sufficient to reject Dr. Buscemi's prescribed limitations in public exposure. *See supra* § II; *see also* tr. 352 (On September 12, 2006, Dr. Alley found no environmental limitations); tr. 376 (On November 9, 2006, Dr. Jensen affirmed Dr. Alley's findings.).

The ALJ also declined to recognize plaintiff's diagnosed depression as a "severe impairment."[14] Tr. 16. The ALJ provided at least seven reasons for rejecting Dr. Buscemi's depression diagnosis, including: (1) consistent informal normal mental status evaluations between 2006 and 2011; (2) a near normal mental status diagnosis during a psychological evaluation administered by Dr. Prescott in August 2006; (3) limited mental health treatment; (4) inconsistency between Dr. Buscemi's treatment notes and diagnosis; (5) the relative expertise of Dr. Prescott; (6) inconsistency with the findings of Peter LeBray, Ph.D., and Dorothy Anderson,

---

[13] Dr. Buscemi's recommendation on March 14, 2008, stemmed from a flu warning. Tr. 412.
[14] A "severe" impairment significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).

Ph.D,[15] and (7) daily activities. Tr. 16–18. Plaintiff disputes the ALJ's characterization of her psychological evaluation conducted by Dr. Prescott and her mental health treatment record. Pl.'s Br. 16–17, ECF No. 15.

Plaintiff underwent a psychological evaluation on August 26, 2006. *See* tr. 319–321. Dr. Prescott diagnosed plaintiff with Dysthymic disorder and noted that plaintiff showed mild to moderate depression. Tr. 321. Dr. Prescott also found the claimant had logical reasoning, intact speech, good short-term memory, good concentration, and average intelligence. These findings were interpreted by Drs. LeBray and Anderson as non-severe. *See supra* note 15.

Plaintiff also received treatment from Dr. Buscemi. For example, on June 22, 2006, Dr. Buscemi prescribed Lexapro. *See* tr. 521; *see also* tr. 16 (noting that plaintiff's depression improved on Lexapro). However, there is no indication that plaintiff sought counseling or additional psychiatric/psychological evaluation despite recommendations from Dr. Buscemi, *see* tr. 475, and Dr. Perry, *see* tr. 562.

Plaintiff's psychological evaluation and limited treatment, particularly when combined with the ALJ's other proffered uncontested reasons, are sufficient to reject Dr. Buscemi's depression diagnosis. *See also* tr. 321 ("She states her depression is not a disabling condition.").

**III. Plaintiff's Headache Symptoms**

Plaintiff also contends that the ALJ erred in evaluating plaintiff's headache symptoms under step two and four of the sequential evaluation. *See* Pl.'s Br. 19, ECF No. 15. Because step two is a "de minimus screening device [used] to dispose of groundless claims," this Court "must determine whether the ALJ had substantial evidence to find that the medical evidence clearly

---

[15] On September 8, 2006, Dr. LeBray concluded that plaintiff's medically determinable mental impairment (Dysthymic Disorder (mild, reactive depression without decompensation or hospital)) was not severe. Tr. 334–46. On November 13, 2006, Dr. Anderson affirmed Dr. LeBray's findings. Tr. 380.

established that [plaintiff] did not have a medically severe impairment." *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citations and internal quotation marks omitted). This Court looks to the record.

On December 14, 2007, plaintiff met with Dr. Buscemi and reported a "new problem" of reoccurring headaches. Tr. 413. Plaintiff reported that the headaches were frontal, dull, without any sound or light sensitivity or nausea. *Id.*; *see also* tr. 471 (On January 25, 2008, Dr. Boren indicated that plaintiff had "many headaches."); tr. 455 (On July 9, 2008, Dr. Boren reported that plaintiff had a headache.); tr. 547 (On September 11, 2008, Dr. Boren reported that plaintiff still had headaches.).

In January 2009, plaintiff informed Dr. Boren that she was having "more headaches;" particularly before she had her last dose of CYTOXAN IV. Tr. 545. Dr. Boren opined that if her headaches improved on CYTOXAN, then they might be caused by her lupus. *Id*.

In March 2009, plaintiff again reported headaches. Tr. 580. Dr. Boren noted that "[t]here was a question if this was related to lupus. I would expect if it is that it will improve on CYTOXAN as it did previously." *Id*.

On May 7, 2009, plaintiff did not report any new headache symptoms. Tr. 579. Dr. Boren noted improvement. *Id.*; *see also* tr. 578 (On May 19, 2009, Dr. Boren noted improvement and did not report any new headache symptoms.); tr. 577 (On June 3, 2009, Dr. Boren noted that plaintiff was "doing well" regarding her headache symptoms); tr. 576 (On September 21, 2009, Dr. Boren did not report any headache symptoms).

On September 23, 2011, plaintiff met with Dr. Buscemi because of a three-day headache and possible lupus flare up. Tr. 650–51. Dr. Buscemi reported "[n]o apparent pain," but

prescribed Flexeril Tabs and Oxycodone. Tr. 651. Plaintiff was directed to call if her condition did not improve. *Id*.

On October 13, 2011, plaintiff met with Dr. Boren. Tr. 655. Dr. Boren reported headaches, possibly tension headaches, but also noted that Flexeril seems to be helpful. *Id*.

On November 4, 2011, plaintiff met with Dr. Buscemi. Tr. 660–62. Dr. Buscemi reported chronic headaches, which she believed may have been related to a sinus infection. *Id*. Dr. Buscemi recommended that plaintiff obtain sinus films and a neurologic evaluation if necessary. Tr. 662. Plaintiff's subsequent sinus films and MRI brain scan were both normal. *See* tr. 17, 684.

The ALJ, having considered the medical evidence, concluded that plaintiff's headache symptoms were not "severe." Tr. 17–18. The ALJ provided at least seven reasons for this conclusion, including: (1) the treatment notes were based on plaintiff's own subjective statement of symptoms, *see* 20 C.F.R. § 404.1508; (2) an unremarkable longitudinal record; (3) effective symptom treatment, *see Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); (4) proximity in time to plaintiff's unfavorable disability decision in December 2008; (5) normal sinus x-rays; (6) a normal MRI brain scan; and (7) daily activities.

Combined, these reasons, supported in the record, represent substantial evidence to find that plaintiff's headache symptoms did not constitute a "severe" impairment under the sequential evaluation. In particular, plaintiff relies heavily on her own subjective statement of symptoms, which were not medically verified. *See supra* § I (upholding the ALJ's credibility determination). Moreover, plaintiff's symptoms were effectively treated in 2009 and improved in 2011. In any event, Dr. Boren and Dr. Buscemi indicated that plaintiff's headaches were likely

20 – OPINION AND ORDER

caused by her lupus, tr. 545, 580, 662, which the ALJ recognized as a severe impairment at step two.

## <u>CONCLUSION</u>

For these reasons, the Commissioner's final decision is AFFIRMED.


IT IS SO ORDERED.


DATED this 22nd day of September, 2014.


_____s/Michael J. McShane_____
**Michael J. McShane**
**United States District Judge**

21 – OPINION AND ORDER